I'd like to reserve several of my minutes of my time for rebuttal, if they exist. This case is a little different than most overtime litigation cases because it's not about whether or not employees are entitled to overtime. There's no question in this case about that. They are entitled to overtime. The question in this case, as I think is clearly presented in the briefing, is really what is the nature of the overtime that the employees, which are the dual function firefighter paramedics employed by the Los Angeles City Fire Department, are entitled to. Whether they're entitled to overtime based upon the platoon system on which they're assigned to work as firefighters, which has to do with they work these platoon shifts and 204 hours in a 27-day work period, or are they entitled to the, let's say, more normal overtime for working over 40 hours in a week. The question here really is determined by what a definition of the term, quote, employees in fire protection activities. What does that term mean? That's the term that's used in 29 U.S.C. 207K to provide for the exemption for firefighters from the 40-hour work week overtime calculation. That term was defined in 1999 by Congress when it clarified to what's known as the 7K exemption. And this — Just to get the lay of the land, as I understand your position, it's that the new definition applies, and you're essentially agreeing that if it doesn't apply, that you lose for the pre-'99, for some period of time? I'm a little confused about that. Okay. That's close, but that's not quite. All right. It is — we're not saying this is a new definition. We're saying this is a clarification. But what I'm trying to understand is that you're essentially — your position on appeal, although not in the district court, is that if that definition does not apply to the pre-'99 period, then some amount of money is due for the pre-'99 period. Yes. So everything, in your view, depends on this statute, A, meaning what you say it means for the post-'99 period, and B, applying to the pre-'99 period. Yes, Your Honor. And we argue that it applies to the pre-'99 period because it is a clarification of the law. Let me tell you my problem with that argument. Yes. It's that we had some regulations here. Yes. And we had an ambiguous statute, a statute that you agree was ambiguous at the beginning, and we have some — we have the agency having interpreted that language in the meanwhile. So why under Chevron isn't that interpretation, whatever it is, it itself has some interpretive problems, but whatever it is, the law over that time period — in other words, if there were no regulations, your view might be right. But with the regulations, how can we now just override what the agency said legitimately over that time period, legitimately because, as you — your argument depends on the statute being ambiguous over that time period. Well, Your Honor, I would suggest to you that the reason is that the regulations themselves were totally ambiguous and very difficult to follow, and what happened is there's this long — over approximately 10 to 12 years. But you agree that they are not consistent with your current view. Whatever they are, they're not consistent with your current view. I agree that they were terribly ambiguous. What happened is, as a result, different courts, different appellate courts were coming down — The court that I'm referring to is analogous to what this Court addressed in the Abko Music case, which the circuit decided on. Were there regulations in that case? My reading of the — That was not — You said there were no regulations. No, that wasn't the regulations, but that was — that's why I say analogous. There, the court — this Court was dealing with the fact that a prior opinion of the Ninth Circuit had construed a statute and said, this is what this statute means. And then Congress says — clarifies the law, and by clarifying, it shows that this Court's earlier opinion was wrong. Don't you have to take on the invalid — the difference between the regulations and an opinion is that regulations, if they're valid regulations, are essentially the law. So don't you have to take on actually invalidating those regulations to get where you want to go? I don't believe so. So I think what you have — what we're talking about here is now that we know Congress has told us what they intended when they — when the 93rd Congress enacted the 7K exemption, when they enacted that exemption, they didn't specifically define — there's not an actual definition as there now is in 203Y. So — but there was — it was left to the agency to come up with regulations to implement 207K. And they came up with regulations, regulations that do say that there — that paramedics will be entitled to — I understand, but not in this instance. I mean, as far as I could tell, the reason that you're not trying to argue the regulations is because, at best, you get into this regularly assigned language, and the case law seems plainly to say that people who are never really assigned are not regularly assigned. So that's your problem. In other words, they may be ambiguous in other ways, but with regard to how they apply here, they don't seem all that ambiguous. Well, Your Honor, we — we do not attack the regulations here because, in coming to — before this Court, we've had to, as we always do in any case that we're taking on appeal, you try to focus on what you believe are the best issues that you can present. There are lots of problems having to do with the regulations. It is not — would not have presented a clean and direct kind of an appellate position, which — so we've chosen to concentrate on. I appreciate your frankness. I do understand what we're dealing with here and what the chances are. But I guess what I'm trying to say to the Court and what our argument is, is that when Congress looks at what has transpired following their enactment of a statute and they see what the Department has done with regulations and what that has resulted in courts — and courts have come down both sides and have looked at that in different ways. For example, there are — there is a circuit court that read it totally in our favor, would have said that anything these paramedics done has to do with fire protection. Which opinion is that? I think that's Lange. But, you know, I'm not saying that there was a body of law that says we're right on the regulations. There were like three or four different theories that different courts have addressed those regulations. So Congress now recognizes that there is a problem. It says we intended something, but that our intention is not — has not been implemented by the regulations, which is really what regulations do. They implement the legislation that has been adopted by Congress. I recognize and I agree when the Department issues the regulations, they have the effect of law. But what they are, it's not — at least I hope it's not that administrators sitting in some buildings in Washington create law. They are implementing what Congress has done. And I agree they implement it to the best of — they try to do it as to what they believe that means. Congress looks at it and says that's not what we meant. Or we didn't mean for you to create this morass that nobody knows what's going on. So we're going to be — we're going to tell you, we're going to clarify that law. They say it in the title of the legislation in 99 that it's to clarify. The legislative history cannot be clearer about the intention of Congress that this is a clarification. In fact, one of the congressional people's comments in the record show that — even believes it to be a simple and non-controversial bill. It was not looked at as anything controversial. It was simply making very clear what Congress had always intended. I'm going to ask you, you're going to tell us why under the — that — the current statute your party prevails. Why Los Angeles wins under the current language. I would like to. First of all, I noticed that — I know that the Court has been given notice of the recent decision by the district court in San Francisco in Judge Hulston's opinion, the Weaver case. And that — that opinion does express our — our views as to the interpretation of 203Y. I would disagree with Judge Hulston's comments at the very end in which she suggests that our case is factually distinguishable from that case. I think there are differences, but they are the proverbial distinctions without a difference. And that brings me to the heart of what we're talking about. The plaintiffs in this case are dual function firefighter paramedics. And they — they squarely fit in the 203Y definition as a matter of law. They are, and it's not disputed, trained in fire suppression. They have the legal authority to engage in fire suppression. And legal authority is — was shown by the testimony in this case, for example, in Chief Namey. And also that you — to do fire suppression work, you have to be certified. You have to be first trained and then you have to be certified. So you have to be authorized. You — you have the authority to do it. As he pointed out in his testimony, for example, as to single function paramedics who don't — who are not certified or others who might not be certified, you can't send them into a hazardous environment. You'd be — the city would be cited by the state. It's against the law to do it. So you have to have authority. Then you have the question of responsibility to engage in fire suppression. And here there is — again, the record is clear. The district court found that the incident commander, that's the commander on the scene, at the fire scene, for example, has the discretion to order the dual function firefighter paramedic to assume fire suppression activities. It's also in the pretrial order. Of course, the troublesome thing is, am I wrong in believing that the record shows that it's never happened? The record shows that three of the plaintiffs who testified said they had not been ordered in. Chief Namey testified that he has — that people are ordered in, that they are ordered in, for example, when there was a tunnel disaster having to do with the MTA, and only dual function paramedic who are certified as firefighters could go into that environment. And they were ordered in. He also indicates that there are companies around the city, throughout the city, where firefighters can be changed from one function to the other in the course of the day. But most importantly, the question is, do they have a — Would you go back over that? There is something in the record that shows that they can be served safely. Yes, that there are companies in which firefighters may be moved around within the day. It's in Chief Namey's testimony. This is one part of the record I wasn't clear about. I mean, are people — the same people sometimes sent off in paramedic vehicles and sometimes in fire trucks? Yes, they can be. So why isn't that dispositive? I don't understand. That whole issue seems to have been avoided for some reason. Well, no. I think there's something about — well, it may be because under the Fair Labor Standards Act, that doesn't matter. I'm not sure. Your Honor, we're talking here about responsibility to engage in. We're not talking here about engaged in. That's another part of the statute. Somebody is ordered, is in fact ordered to do it. It's pretty good evidence that they have the responsibility to do it. They have the responsibility. Let me give you an issue of why they have the responsibility and why the incident commanders, the people on the scene, have to be the ones to make those determinations. For example, the dual-function paramedic firefighters wear a yellow helmet. The single-function paramedics, who are not certified as firefighters. And that's true whenever they're sent out on EMS? Yes. They wear yellow helmet. The single-function do. That's not only when they go to fire. On this record, they wear separate helmets. And why do they wear that separate helmets? So that at the scene, when the incident commander, and a fire scene is not something that's totally organized When the incident commander looks around and things are happening, he knows what his assets are. He can look around, and if he sees a yellow helmet, he knows if he needs to use that person to throw a ladder or to help somebody who's going to leap off a building, or if something else is going on and he needs it, he can use that yellow helmet. But there wouldn't be discipline for it. No. What Chief Mamie said, and this is, I submit to the Court, misrepresentation in effect that comes out of the appellee's brief. He says, if they are ordered to perform fire suppression activities, they receive an order from the incident commander, they must obey it. They are obligated to comply with it, and they can Where is that in the record? Okay. One moment. Take a look at the excerpt of record pages 123 to 124, where they're obligated to comply with the orders. The evidence also shows, for example, and one of the firefighters who testified, one of the dual function, he testified to this as well, that if the dual function paramedic firefighter is the first person to arrive at the scene, in other words, maybe because location when the call goes out and they get there first, that dual function firefighter paramedic assumes the position of incident commander. No one can be doing more in the way of fire suppression work than the incident commander. That's the person in charge of everybody who arrives there. Now, once a more senior officer arrives, he may relinquish the command. But I think that shows the responsibility to engage in fire suppression. To go back to your question, the evidence is that when, that the fire department expects that these dual function firefighter paramedics, if they see an emergency situation, a life-threatening situation, they may also volunteer to do something, throw a hose, throw a ladder. And what Chief Namey said, while we expect them to volunteer, if they don't volunteer and the three dual function firefighter paramedics who testified in this case said they've never volunteered, he said if they don't volunteer, we won't discipline them. That's different than if they do not follow a direct order. You could not have a fire department run if firefighters are not obligated to follow a direct order, Your Honor. The other thing that confused me about the record is that I gather that the firefighters don't usually fight fires. There's something in the record that suggests that 80 percent of the calls for everybody are for medical emergencies. And so what's the determining factor, what trucks they're riding in? Well, that's what the appellees would want it to be. But that's not what 203Y is about. 203Y is about who they are. They are firefighters. They are dual function. They're firefighters. They're paramedics. And 203Y makes that very clear now because what it says is that you have to be trained in fire suppression. You have to have the legal authority to engage in it. And you have to have the responsibility to engage in it. In other words, you're accountable if you're given an order to do it. And then it says in the last part of 203Y, they have to be engaged in the prevention, control and extinguishment of fires. That's fire suppression. Or, not and, or response to emergency situations where life property or the environment is at risk. When you look at that and you look at the very beginning of 203Y where when the Congress has started to define employee and fire protection activities, it says it means an employee including firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel or hazardous materials worker. 203Y is talking about the employee. Now, one weird thing about your position, though, is that you have two people in a paramedic car and one of them can be covered and one not. Yes. And it is, it's a strange result, but it's a result not of whether the firefighter, how the firefighter paramedic is compensated. It's a result of Congress, again, is not perfect. And when it defines, when it creates the definition in 203Y, it did not cover that single function paramedic who's just a paramedic, not trained, not certified as a firefighter. And what's happening is fire departments all over the country, and it shows through the legislative history here and all, have been moving towards this integrated system where eventually we'll see everybody are dual function paramedic firefighters because it provides the best emergency and safety care for the populace. But you're over your time. Oh, thank you, Your Honor. I appreciate that. May it please the Court. My name is Alan Kaufman. I represent Cedric Cleveland, who's the plaintiff, Pelley, along with 119 others. I want to keep your voice up. Thank you, Your Honor. Judge Marshall correctly concluded on the issue, the dispositive issue that's before the Court on appeal, that the city did not meet its burden of proving that the plaintiffs fit plainly and unmistakably within the language of 207K as defined by 203Y. On the record before the Court, Judge Marshall correctly held that based on the record developed at trial, that the plaintiffs did not have the responsibility to engage in fire suppression. Now, there is in the record, in the briefs, a description of how the fire department is organized. The plaintiffs in this case are plaintiffs who have fire training and paramedic training, but their job is to ride in ambulances. This is one thing I asked your opponent. Is there some indication in the record that those people, however, who are trained have been and are reassigned for certain time periods? And I understand that time is out of the case because the city has agreed to pay it, but why doesn't that answer the responsibility question? They can be assigned here. They can be assigned there. The persons who are plaintiffs are permanently assigned to paramedic ambulances. They can be. The city retains the authority to take the plaintiffs off the ambulances and put them on fire trucks. Right. And there are fire trucks whose staffing includes cross-trained paramedics. Right. The assessment engine, the paramedic engine. Why does that have any relevance under the statute? I must say to an outsider, this whole thing is very bizarre. I mean, if you're riding in a fire truck and you're going to give paramedics services in a medical emergency, the answer seems to be one thing in your view. And if you're riding in an ambulance and you're going to do exactly the same thing for exactly the same reason, the answer is something else. Yes. That is the result, but that's because that's the way Congress wrote the statute. Why? Where in the statute does it matter what truck you're on? In other words, it's before the court. Responsibility to engage in fire suppression. So you're not going to a fire. I mean, if you're riding on a fire truck, but you're not going to a fire, you're going to a heart attack victim's house, then why is it any different? The result is different because Congress said it's different. It's your line and it all turns on responsibility for fire suppression. When the fire alarm rings, when the fire alarm rings on the facts of this case, the persons who are assigned, the employees assigned to fire trucks, they go to those alarms. They're responsible for fire suppression. The issue that Congress addressed in this statute is an issue that the courts were concerned with under the regulation, which is when those firefighters on the fire trucks do go to those non-fire calls, they go out because they have paramedic training and they go to some non-fire calls and or calls that they go to. I thought the record shows that 80 percent of the fire calls are not fires. Quite a lot. One of the issues that the court struggled with is whether that time that those firefighters who are on fire trucks spend going to non-fire calls, whether that is considered exempt time or non-exempt time for purposes of this 207k exemption. Because the 207k exemption means that the words used are employees and fire protection. So the employees and fire protection were defined by the Department of Labor. And the Department of Labor used the test. But where in any statute or regulation does it matter what truck you're riding around on? It matters whether your legal, whether your responsibility is for fire suppression, to engage in fire suppression. And when you're sent out to a heart attack victim's house, nobody's responsibility is fire protection. What we say based on this record, the plaintiffs, in contrast to those persons assigned to fire trucks, who, when the fire alarm rings, go to fire alarms, and sometimes, a good bit of the time, when the alarm rings, they go to non-fire calls. Those non-fire calls are not, that time spent is not considered to remove their exemption as employees in fire activities. That's what Congress meant. The plaintiffs, the contrast is, based on the record in this case, very clear. The plaintiffs, in this case, are not responsible for fire suppression because, as the district court found, the paramedics are not regarded by the fire department as a fire suppression resource. That's undisputed testimony. They're not dispatched to fight fires or for a firefighting function. They're dispatched for medical purposes. The dispatcher who dispatches a paramedic ambulance, and again, that's the only time we're talking about. The plaintiffs, in this case, we're only talking about the time that they're assigned to be paramedics on a paramedic ambulance. The dispatcher who dispatches a paramedic ambulance. Kagan. So in the record on page 126, it says, During a normal 24-hour shift, is it possible for a dual-function firefighter regularly assigned to a rescue ambulance to be reassigned to a paramedic engine company or some other resource? That happens on a routine basis with staffing shortages around holiday periods, et cetera. And also he says that there are nine rescue ambulances that we only allow cross-trained firefighters to ride on because of their involvement, because at LAX they can be required to provide backup into the emergency seat of an airplane crash, and also they have rotational houses where the firefighters rotate to provide relief, and then there's this business about the tunnel incident and so on. So how does that differ? That's what I'm having a very hard time with. The plaintiffs in this case, we're talking about the plaintiffs on paramedic ambulances. What he's talking about there, we don't dispute that the city can take a plaintiff or anybody who is a cross-trained paramedic firefighter, take them off the ambulance. That's their permanent assignment. But because of needs of the fire department, say, we're taking you off that ambulance. We're going to put you on a fire truck. Doesn't that prove that they have responsibility to fight fires, which is if they're ordered to ride in the fire trucks, they have to ride in them and fight fires. Because in the facts of this case, that's not the periods of time we're talking about. They're not on fire trucks. We don't dispute that the fire department can reallocate. But the statute doesn't talk about trucks. It talks about people. It talks about responsibility to engage in fire suppression. And what we're saying, based on the record in this case, when the plaintiffs are assigned to paramedic ambulances, they have no responsibility to engage in fire suppression. None. They hardly ever go to a fire. The record is. And when somebody on a fire truck is sent out to go to a medical emergency, they also have no responsibility. Yes. And Congress said that if you are, and we believe this is how you must read legislative history, if you are the person who goes out when a fire alarm comes in, if you are assigned to a fire truck, if you are responsible to engage in fire suppression, when you show up at the scene and there's a fire, you're responsible to engage in fire suppression. If that's the case, then during that time, when you go out on calls that are non-fire, we will not consider that time non-exempt. That's what this statute is addressed towards. That's what the legislative history shows. And that was one of the issues that the courts struggled with under Department of Labor regulations, the question of whether that medical time spent by firefighters, whose responsibility is firefighting when there's a fire, are they made non-exempt when they spend more than 20 percent of their time doing medical work? And Congress enacted 203Y to say no. Firefighters who are responsible for fire suppression, to engage in fire suppression, when they get to the scene, they engage in fire suppression. The facts of this case, in contrast, the plaintiffs, when they get to a scene, they don't have any firefighting equipment. They don't have any ability to pump water. They don't have any hoses. They don't have any extrication equipment. They don't even carry an air pack. But they can go back to the fire department and the fire and the chief can say, the next time we get a fire alarm, you're going to ride in the fire truck. They can take them off the ambulance. It rarely happens because there's a shortage of paramedics. It usually happens, the testimony is in the record. It usually happens in the other direction because there's a shortage of paramedics, that people are taken off the fire trucks and put on ambulances, and they run medical calls all day long for months on end. They never show up at a fire. But certainly we contend, as far as this following orders business, that the city can order its employees to do things and the employees have to comply, that the city can take the paramedic, cross-trained paramedic, off the ambulance and put them on a fire truck. And what we say is when that happens, we concede. That's what the statute means. When you're on a fire truck, you have the responsibility to engage in fire suppression because when you show up at a fire scene, when the fire alarm goes off, you're the one who's going to go. So it's part of your job that if the, and it's not part of the job of the non-dual function, of the single function paramedics, that if the chief wants to assign you to a fire truck to fight a fire, he can do it. And when you're on a fire truck. That's your responsibility. So you have the responsibility to fight fire. So I don't understand why, I'm having so much trouble with why the matters, whether in any particular instance you're sent out on the paramedic truck, car or on the fire truck. It doesn't change from moment to moment. Although there are nine stations, this is in the record also, where you rotate, but not minute to minute. You don't rotate based on a call. You don't get assigned when the alarm goes off. The chief doesn't say, well, you go out on the ambulance or you go out on the truck. But you do rotate between the truck and the ambulance. That's not this case. That's not the plaintiff's. Those people are conceded to have the responsibility and they're not being covered by the damages here? The claim in this case does not cover any persons working in those fire stations for any period of time. Our claim is limited. And this is really consistent with FLSA jurisprudence. Our claim is limited to the plaintiff's assignment to paramedic ambulances. And the testimony is overwhelming that plaintiffs, when they're assigned to paramedic ambulance, and these are permanent assignments either by bid or by assignment. You must stay on the paramedic ambulance for a year. When you're assigned and work in a paramedic ambulance, you hardly ever even go to a fire. And when when you do go to a fire, you have no responsibility to engage in fire suppression. You're not equipped. You don't have the protective. You don't you're not required to wear the protective gear. Coming to the testimony of Chief Nimi, we read the record for him to say that. And there is. These are his words on page 145 of the record where it says. If they're given an assignment and they didn't take an action, I think I'd ask them why they didn't try to throw a ladder to save somebody's life. But I wouldn't discipline on it. Now, maybe it's maybe it's unclear. I think the testimony of Chief Nimi, if you compare his earlier testimony that the court referred to on page 123 to 125. He says, yes, we retain the right to reassign the person to a fire truck. And if we reassign the person to a fire truck, they must follow that order. When they're on an ambulance, he testifies later. He testifies that if they're given an assignment and didn't take an action, I wouldn't discipline them for. He's talking about when the paramedic ambulance shows up and they're given an assignment. They wouldn't discipline him for it. Now, perhaps the record is ambiguous in this to this extent. Perhaps he's talking about not being disciplined for not volunteering to take an action. The question was posed in the record. Would you do the paramedic, do the cross-trained paramedics on the paramedic ambulance have to take an action voluntarily to save a life? And he said we would expect them to do that, but he wouldn't discipline them if they didn't. He also says that they purposely sent these people out, for example, in the Metro Rail incident, the Hazmat incident, because they're cross-trained. And they needed to have people who were cross-trained in order to do that. So there are cross-trained, Your Honor. There are cross-trained paramedics riding on fire. There are 530 cross-trained paramedics. They are assigned, as we relate in the record, to fire engines as well as ambulances. But there's a different function. It's not clear in the record that the paramedics, the dual trained, dual function paramedics that he's talking about that went in on that incident came up. We're talking about dual function firefighter paramedics regularly assigned to rescue ambulances. Are they expected to volunteer to perform firefighter duties in appropriate circumstances? Yes. But I'd like to clarify that I have sent them into certain incidents where we expect them to perform that, such as the Metro Rail incident or a Hazmat incident. I don't know what that incident is. So that's directly responsive to firefighter paramedics regularly assigned to rescue ambulances. Your Honor, I don't understand the record that way, especially in light of his later testimony on 146. It seems to me that this is a dispositive. His answer to the question of whether he expects the plaintiffs when they're riding on ambulances to volunteer to save somebody's life, his answer is he would expect them, but he wouldn't discipline them if they didn't. Now, how can that be responsibility to engage in fire suppression? If you show up at a scene and there's an action that can be taken to save someone's life and you don't take that action and you're not disciplined for it, you're not disciplined for taking an action that would save somebody's life. Now, to my to my understanding, that is dispositive. How can you be considered to be responsible for to engage in fire suppression if you will not be disciplined for not taking an action to save someone's life? In the common sense, dictionary definition of responsibility, that does not satisfy. And that's what the court is supposed to apply. The statute, 203Y, was intended to draw a line. It didn't make, it doesn't make all paramedics, all paramedics exempt. It doesn't make all cross-trained paramedics exempt. It requires that in order to be exempt, you have to have the responsibility to engage in fire suppression. And on this record, they do not, they cannot reasonably be considered to have the responsibility to engage in fire suppression for all the reasons that the district court found, the factual reasons. And again, they're not dispatched to fires. They're not equipped to fight fires. They're not expected to fight fires. That's the record in this case. They have no equipment, and they won't be disciplined if they don't voluntarily take firefighting action. And if you won't be disciplined, again, that seems to me is dispositive on the issue of whether you have the legal responsibility. But, Your Honor, there is, in terms of the meaning of the statute, we claim that that is clear on its face. You interpret the statute. How would you define responsibility then? If these people can be assigned to fire trucks, and they, when they are, and they sometimes are purposely assigned to hazardous areas because they're cross-trained, but in fact, let's assume the record shows that they, while they're on the paramedic ambulances, they never actually fight fires, or if they do fight fires, they volunteer. So what does responsibility mean if the record shows that they, I mean, does the record deny that, or does the record show that if they're on a fire, at a fire scene, and it's 9-11, and the chief says go in there and fight the fire, they have to do it? I would say that if it's an extreme emergency, and the chief turned to them and said, you suit up, go to a fire truck, get an air pack, go in. We don't deny that they have to follow orders. So why don't they have the responsibility? Because that's, in terms of how the FLSA is interpreted, it's an applied. Let's try to find out why, exactly. Because the FLSA, as far as exemptions go, and this is a longstanding jurisprudence in the FLSA, the exemptions are applied based on your day-to-day actual job duties, not based on what you theoretically might do, but do not. Except this statute talks about responsibility. So what does it mean if it doesn't mean something you might be ordered to do, but weren't necessarily? It means what you actually do, which is, again, why we, the normal rules for interpreting statutes means you, for an undefined term, you refer to the dictionary. So we cite many definitions of the word responsibility, which means accountability. That you have your job to do something and you're accountable for it. Here, the testimony is they're not accountable for fire suppression. When they show up at the scene, rare as it is, one or two times a year, they might show up at a fire scene. They're dispatched to do medical care. They don't get out of the ambulance and have any responsibility to engage in fire suppression. If there's an order given, which is never done, I mean, the plaintiffs are never ordered to do that, and it might be a rare circumstance, as all employees of the fire department, they would have to follow an order. I mean, I would venture to say that a single-function firefighter, although he's not trained, a single-function paramedic, but let's say he's given an order at the scene, pick up that ladder or, you know, give that guy a hand. I would venture to say that everybody has to follow orders. Now, so I don't see. But that would be an illegal order. Well, everybody has to follow orders. The FLSA is applied based on what you actually do, not theoretically what you do. It might do, but don't. And if the statute here is interpreted in a way that. What if they had, what if the records show that they, you know, ten times a year went to fire trucks, went to fires in their paramedic ambulances and were ordered to fight fires? If the facts were that they went to fire scenes and were ordered to fight fires. Once in a blue moon, but they were occasionally. We would still contend it's not their responsibility. In the rare unusual circumstance, again, because the FLSA jurisprudence is not based on, it's based on your actual job. What is the statute about? I mean, there was an attempt. Who does it apply to? The statute applies to, again, I come back to this 80-20 rule. In the era when the Department of Labor regulations covered this area, the regulations still to this day contain this rule about 80-20, that if you spend more than 20 percent of your time doing non-exempt duties, non-fire suppression duties, then you lose the 207k exemption. And there was and there is litigation over whether medical duties performed by firefighters more than 20 percent of the time destroys the exemption. And some cases held that medical duties were non-exempt. In some cases held that medical duties performed by firefighters. They passed a statute. They passed a statute. And the statute drew a line. And the line drawn was for firefighters, for persons who have the responsibility to engage in fire suppression. When we claim those are the persons who, when the fire alarm rings, go out and fight the fire, when they perform medical duties, it doesn't make them non-exempt. It takes away this 80-20 rule. And, in fact, in legislative history, Your Honor, there is a comment that makes it clear that that was the intent of this bill. It's in the comments of Representative Clay. And it says, the policy it reflects, this is on page H11500 of the congressional record. It says, the policy it reflects ensures that unreasonable burdens are not placed upon fire departments in accounting for hours worked. And that shows that what this bill is addressed to is this 80-20 rule. And it says that when you're responsible for firefighting, when you're working as a firefighter, when your job duties are firefighting, we're not going to worry about if some of your calls are medical calls. And we're not going to count the percentage. And we're going to relieve the employers of that burden of determining how much of your time is spent on medical calls and how much is spent on firefighting. That's the line that's drawn by 2031. I have one last question. You mentioned something which I'm a little interested in also. The regulations have never been withdrawn. What does that mean? I'm not sure what that means, Your Honor. But the Department of Labor, I would say, is notorious for not promptly revising regulations. We would say that insofar as 203Y defines the term that it controls, insofar as this question, this 80-20 rule, as applied to persons whose job, whose responsibility is to engage in fire suppression, the 80-20 rule doesn't strictly apply. So you can engage. Those firefighters will still be exempt even if they spend their time doing medical work. But as to the plaintiffs in this case who are not responsible to engage in fire suppression, because that's not their job. Based on the record in this case, Judge Marshall correctly found that they did not have the responsibility to engage in fire suppression. There is one other legislative history matter that I, with much to my chagrin, must bring to the Court's attention. Neither party in the briefs in this case cited to the legislative history on 203Y that's contained in the Senate record. And that is S.15-007, November 19th, 1999. There is a short section tucked in amongst other discussion that we believe, likewise, shows that this bill was addressed to those employees who are engaged to perform firefighting, in contrast to the plaintiffs in this case. And it was addressed to make clear that when they engage, when those firefighters engage in medical work, they're non-exempt. The comments of Senator Kennedy are illustrative. He makes clear that you still have to be the parties responsible for firefighting. And if this Court were to find that an exemption can be obtained by the mere theoretical possibility or rare or unusual possibility that you might be ordered to do something other than what your actual job is, that would tear or rent the fabric of FLSA jurisprudence that for years has required exemptions to turn on what you actually do day to day, what you actually do day to day. And we submit that the district court properly found, applying the established FLSA jurisprudence, that the statute is interpreted liberally in favor of employees, exemptions are interpreted narrowly against employers, and the employer has the obligation to show that the employee fits clearly, plainly and unmistakably within the exemption. Applying those well-established rules to the facts of this case, Judge Marshall made the correct decision. And if the exemptions are to be obtained merely based on theoretical or unusual job duties, it would tear a large hole in the FLSA jurisprudence through which employers would no doubt come pouring through in the years to come. Are there no further questions? Thank you. Thank you, Your Honors. First of all, as to the intention of Congress and the legislative intent, I direct your attention to the comments by Representative Ehrlich, who is the sponsor of the bill. And he explains why they put in 203Y, because it had to do with a case in his own district, the Ann Arundel case. And it makes it very clear, because that's precisely the kind of result, what resulted in Ann Arundel is the result that the plaintiffs are asking here. The sponsor of the bill and all of the others that spoke on the bill make it very clear that it's not what we want here. What counsel was talking about now is a reading of the statute of 203Y that leaves out of the statute the key parts of the statute. There's no discussion. There's no consideration. Well, no, it doesn't, because it deals with the fact that you had a sort of anomaly before, which is that it purported to cover firefighters, but most firefighters don't cover firefighting, don't do firefighting most of the time. So if you really apply this 80-20 rule, most of them would be outside the provision. They had to actually fight fires that amount of time. Well, no, not for the firefighters, because the 80-20 rule also included the things that firefighters do in keeping their equipment up. Oh, no, it didn't in the statute. That's my understanding of why they've now made it, and now it's in the statute, but it wasn't before. No. No, it always has been as to firefighters. There's never been a question that firefighters qualified for the exemption, even if they sat in the firehouse and waited for a fire and never got called out on the fire. But if they are called out, and 80 percent of the time do medical EMS work.  That's different. And that is what, yes. And that's what the statute was really trying to cover. But what the statute said. Well, but that's why the statute, when you look at what 203-Y says, why they're wrong. Because it says employee and fire protection activities means an employee, including, it says a firefighter, but leave out the word firefighter for a moment, including paramedics, firefighters, emergency medical technician, rescue worker, ambulance personnel, who is trained in fire suppression. The paramedic who's also a dual function firefighter is trained in fire suppression and has the legal authority. They have the legal authority, has a responsibility to engage in fire suppression. As we've talked about, the evidence is very clear. They have the responsibility. The question is, counsel says, but they're not qualified for the exemption unless they're actually doing it. They're assigned to it. But that's not what the statute says, because the statute goes on to say, and under 2, is engaged in the prevention, control, and extinguishment of fires. That's the firefighter who's doing the fire suppression activities. Or, the statute uses the term or, response to emergency situations where life, property, or the environment is at risk. So Congress contemplates that you will have these people who are properly trained, who are part of the fire department, can be used for fire suppression, can be backing up for fire suppression, but they're being assigned, they're engaged in the response to emergency situations where life, property, or the environment is at risk. And that's basically all they do, isn't it? That's primarily what they do. But they're there, as Chief Namey says, he's asked a question across. Somebody has a heart attack, you call 9-1-1. That's right. The fire department paramedics. That's right. And what Congress is now saying, those people are exempt. They come under 203Y. And the reason is, to have a service that provides the best care for everybody, we need to have people that can do all of these jobs. And it's true. Maybe most of the time they're out there saving people who have heart attacks. But the problem with this record is it isn't most of the time. It's all of it. For these people, not for the people who are riding in the fire trucks. Isn't that right? No. It's when they're assigned, but they can be changed. So what Chief Namey says, if you look at Excerpt of Record, page 123. How often they're really changed. No, it doesn't. There's not statistics as to how often. But he points out that they can be changed. In fact, on a daily basis, we can detail people around and close companies, such as during the holidays where we have to close resources because of staffing shortages. We would assign a dual-function firefighter paramedic to any resource in the fire department. They need the flexibility. Counsel, on a slightly different point, three times during his presentation, made the point that they're not required to have emergency protective gear. That's not true. That's not what the record shows. The record shows their turnout gear, which is that heavy protective clothing they have to wear when they go into the fire scenes and other things. They have to keep those with them. No, I thought it showed the opposite. No. No. Actually, what I thought it showed was that they never did it. They used to have it until after the deposition of this case. No. Well, what Chief Naney says is, yes, there's a memo that goes out during pendency of this case. The memo reminds people that you're supposed to carry that stuff with you all the time. He says it's always been our rule. It may have been unclear and people weren't doing it because it was difficult to keep them in the right place in the ambulances, there wasn't that much room. But he made clear in the memo that went out, said, remember, you've got to take this stuff with you. Plus, they also have to have with them at all times their individually molded faceplate. The faceplate is to be used with the breathing apparatus. And that's not true of the single? Right. Is it not true? There's nothing in the record that should suggest they do it because they don't go. As Chief Naney says in his testimony, they can't go into that hazardous atmospheres. He uses the term atmospheres, which I believe is like when you mentioned hazmat. That's those kind of hazardous that could be a fire with chemicals involved and so on. But you cannot send the single function people into that. They're not authorized to go in. They're not certified. So they wouldn't need it necessarily when they're at the ambulance and taking care of the people. Judge Marshall, she basically concluded that they didn't need this burden of proof. Yes, Your Honor. But that had to do with the question having to do under the regulations. And that's why we're not fighting about the regulations here. Because under the regulations there were questions that really needed factual determination as to the amount of time and what people are doing and where they're assigned. Our argument now is that under 203Y, these dual function firefighter paramedics, as a matter of law, are, they should be paid the same overtime way that other firefighters are paid. Isn't the question of what their responsibility was ultimately a question of fact, if she's applying the right standard? She is what she talks about when she says they didn't have the responsibility to engage. She is talking about, you can see from when you look at her whole order in context, she's looking at the argument that plaintiff has made that if they were not actually engaged in fire suppression activities, then they didn't have the responsibility. And what I'm arguing here is that under 203Y, there is this idea of responsibility to engage in fire suppression. But there's also what you're actually engaged in is a different subject. That comes under the last part. And that's either prevention, control and extinguishment of fires, fire suppression, or response to emergency situations where live property. But the folks that are just, they're not trained in administering emergency medical care. Well, they're trained in that, but they're not trained as firefighters. So they get the overtime benefits. But Congress has, as the single function people that you're talking about, Congress has not addressed it. It's left that, I could make an argument to you, Your Honor, but it's not our case here, that under 203Y, they would come under, they could perhaps come under it. I'm not saying it, but that's not the case here. What we're looking at here is should the firefighters who are being called on on a regular basis to go into these dangerous circumstances, shouldn't they be, and then you have the backup firefighters who are perhaps regularly assigned to the duties where they're doing the response to emergency situations. Should those people get paid overtime at a different and much more favorable way than the firefighters? There are other firefighters who are going in and on the fire equipment every day. It doesn't make any sense, and it's not what Congress. Dangerous conditions. Well, the firefighters, the ambulance drivers are. No, the ambulance drivers aren't driving in traffic. Well, yes. That and that's why. Yes, and that's why Congress in 1999, in 203Y, says they've got to be treated the same. And it's also so that the municipalities can better function, can provide this kind of training. They have to have the flexibility of the resources. We need integrated fire departments that can provide all this and that you can move people around, not situations where you're going to be paying out huge resources. And if they can't do it, then they have to come up with different ways to work these people, and then you're going to have them on non-platoon systems or something. Then the whole system breaks down. I know you've given us a lot of time. Thank you. OK. Well, we'll recess until two o'clock this afternoon.
judges: Browning, Pregerson, Berzon